at L. Mr. Cohn for the appellant, Mr. Ellwood for the appellees. Good morning. If it may please the court, Michael Cohn on behalf of the appellant Harry Halliburton, it is my great pleasure to present Mr. Barko for the appellant, Mr. Ellwood for the appellant, and Mr. Halliburton for the appellant. Mr. Halliburton, you may begin.  This holding is wrong as a matter of law, because all false claims act claims can be established on the basis of circumstantial evidence alone. As Justice Thomas wrote, circumstantial evidence is not only sufficient, but may be more certain, satisfying, and pervasive than direct evidence. In this case, the evidence establishing a dispute of material fact is First issue of material fact we're looking at is whether there was a kickback scheme. Can you explain to me your theory of implied certification with respect to kickbacks? Yes. In Escobar, what you have is a situation, I think Escobar lays out a theory of implied certification, and the example Judge Thomas uses there, which is a piece of land, and they don't identify everything in the document that they say is true and correct, they just left out something because it shouldn't have been there. And the same thing goes to all the claims here. What KBR left out was that they knew that kickbacks were being paid, and they didn't tell the government about it. That they knew that they had an internal compliance program that was not functioning and not in compliance with the Anti-Kickback Act requirements, which was the only requirement that had to be satisfied. It was specifically in the Log Cap 3 contract itself, the only self-reporting obligation found in the Log Cap 3 contract. And the government has made clear that kickbacks is of greatest concern to it because it affects all contracts, and it could have such a devastating effect that there needs to be clear and precise following of Anti-Kickback Act regulations to ensure that the government is getting what it's paying for. And so in this case, you have KBR, every time they submitted an invoice that included payments from DMP, Dowden Partners, they understood that Dowden Partners was paying kickbacks, and they didn't tell the government about it. That's the theory. And how do we know that that's material here when the government paid the 2012 certified claim? Well, the government, first, the certified claim specifically includes a provision that says under the Contracts Dispute Act that paying the certified claim itself cannot be used to demonstrate that KBR cannot rely on that fact to demonstrate that the government paid it with full knowledge of the problem. The Contracts Dispute Act specifically says that the payment cannot be used as evidence that the government paid against the claim. That is because the real question is, why did the government require KBR to file the certified claim? That, I believe, demonstrates that the government was unwilling to accept the veracity of the construction activity that was going on, and they required that final form of payment to be done in the form of a certified claim, knowing that that payment could not be held against the government, and that the government could still go after KBR for the fraud. How is that argument consistent with ESCOBAR or Universal Health, whichever you want to call it? ESCOBAR, I think, makes clear that the government has to have actual knowledge. In this case, there is just no actual knowledge of kickbacks being paid, and there's no actual knowledge that there were false statements inserted into the certified claim itself. And more importantly, in KBR 2, the court identified that KBR's assertions would not be accepted at full value. Well, I wrote KBR 2. That's not the way I interpret KBR 2. And that's a problem for you, since I wrote it. Well, I agree that I can only interpret what I read. And I think what KBR 2 does say is that there's a compliance factor, and there's an attorney-client privilege factor, and the two are separate. They're not combined. And in this case, it's the compliance issues, the requirement that KBR comply with that, those requirements. You can't hide behind attorney-client privilege not to comply with a law requirement. If you like, I could go on to the crime-fraud exception. But I think that there's still... What's your theory on how that applies here? About the crime-fraud exception? Mm-hmm. 20. Okay. Here's how I see the crime-fraud exception. You have... KBR has established a code of business program required by law that had to be created as a way of... as a management control to facilitate timely discovery and disclosure of kickbacks. KBR then crafts the program so that all of the allegations coming in, all the tips that come in that say kickbacks are being paid, kickbacks are being paid, can never trigger the reporting obligation. That's what Mr. Heiner testified to at his deposition. And he says the reporting obligation can only be triggered as a result of the investigation that follows. So the invest... Okay. We know that the investigation that followed demonstrated that was direct and circumstantial evidence that kickback was paid. And based on that finding, a report had to be made. The lawyer who conducted the investigation was responsible for reviewing the report and was also the individual responsible for complying with the mandatory reporting obligation. As that lawyer, Mr. Heinrich was... could not either engage or assist his client in comp... to not submit the required disclosure based on the facts in the report. Instead, Heinrich actively assisted his client to conceal the fraud when he closed out the code of business conduct investigation without making the lawfully required report to the government that kickbacks may have been paid. Mr. Heinrich gave the pretense of unconditional disclosure because the way that COBC operated, the investigation had to take place and it was only on the basis of the investigation that the reporting obligation was triggered. And the government had a right to rely on that investigation. The government understood it was relying on those investigations. The government understood that KBR had to retain the investigative reports as a requirement under the AKA. And the government understood that those reports would be subjected to internal and or external audits to ensure compliance was happening. And Mr. Heinrich was actively involved with the DODIG that led to KBR receiving credits for active cooperation. So the government has this understanding that KBR is actively cooperating, is complying with its obligations and that presented the pretense of unconditional disclosure when Mr. Heinrich got the report with the information saying that kickbacks had been paid, triggering the obligation that Mr. Heinrich had to report to the government that a kickback may have been paid. And instead of doing that, he did the overt act of locking it away in a closet and not comply with his legal and ethical duty to tell the government what he'd read. I think you wanted to save time for rebuttals, so we're into that time. Thank you. I think I'm going to just make one point and then if there are no further questions, we'll rely on our submission. But the point I wanted to make was that I think what Judge Lambert was talking about when he talked about direct evidence was not the difference between circumstantial evidence and direct evidence, whether there's, you know, you have to draw inference from it, but the fact that what Mr. Barkow is trying to do here is have information about contracting irregularities prove basically both of the big elements of a kickback. Ordinary a kickback is a gratuity and then you show that it was done for the purpose of improperly obtaining a rewarding favorable treatment. And what he's trying to do in the absence, really, of evidence of kickbacks on this account is to say, you know, there's so many contracting irregularities, that alone is circumstantial evidence of a kickback. And there's no case of these sites for that proposition. Every case of these sites involves either direct evidence, such as in VAP or DEAN or VAVRA. There was testimony from the very people who And, of course, in Hatch there was circumstantial evidence, but it was evidence that the contractor who got the contract for consulting services got a $25,000 payment, deposited $19,000 and took $6,000 in cash in 1987, when it was even more unusual to be carrying around that kind of money, and took it to where the government official who gave him the contract was. And he gives you no authority for the proposition that it can serve double duty like that. But here he's got a declaration from somebody who walks into a room and there's a KBR employee and the subcontractor and an empty envelope on the table or desk. And in the KBR employee's hands is a stack of bills with a $100 bill on the top. And KBR employee sticks it in his pocket and says he was making change. I don't know that I've ever seen anybody make change with $100 bills. But maybe I don't run into right circles. So that looks like pretty good direct evidence to me, doesn't it? But the thing is, you know, even after all the discovery that occurred here, he was unable to do anything to try to tie that instance to any of the subcontracts that occurred here. Mr. Poe isn't mentioned once in the 77-page complaint that mentions at least a dozen other people. He was a very peripheral figure. He didn't depose Mr. Poe before Poe passed on. And so, you know, we don't have really his take on anything. All we have is basically that with nothing to tie it to the subcontracts at issue here. And the triple canopy stands for the proposition that you can't just, it would be unduly speculative to say that just because there was fraud in one instance means that it's universal and it can be applied everywhere. And that's the only evidence that has to tie to it. Why, if we're taking all the inferences in the light most favorable to the non-moving here, the plaintiff, why can't we tie that to one of the subcontracts at issue here? Because there's no evidence. You can only draw reasonable inferences. And there's no reasonable basis to say that of all the contracts that are swirling around, it was done with respect to this. And even beyond that, you don't have any evidence, again, that it was material that resulted in the submission of a false claim. Is there any evidence about when this occurred? I think there might be evidence of when... I'm talking about the Poe thing. I think the only evidence we have of when that occurred, and I might be wrong about this, is just the dates that we know that Poe worked there. And I honestly don't know exactly when it was. It was probably in kind of the ballpark range of 2003 to 2005. But I honestly don't know, as I stand here, exactly when that occurred. But certainly Mr. Barco hasn't tied it to this. And when you have that little evidence of an actual kickback, I think that it's not enough to hold up the entire case. Because as they indicated in Triple Canopy, you have to tie the fraud to the actual case. And in this case, Judge Lamberth said there was not any evidence that it resulted in any false claims. You can look through Barco's opening brief in this court for some theory about why it resulted in false claims and scratch your head, because it's just not there. It doesn't really arrive until the reply brief, when he starts saying, well, it's because they had an obligation to report, and they failed to report that. But he doesn't ever explain why that would be material to payment. Because if you look at the actual regulations at issue, which is of the FAR, it's 52.203-7. The regulation requirement is C2. It doesn't say anything at all about payment. You get to C4, and it says, if there's a kickback, you can offset that. You may offset that. And the fact that there is no indication that the reporting requirement of reasonable grounds is tied to payment, I think it's an uphill road to say that there is anything that would be material about the failure to report. And again, this didn't even occur until the reply brief, which is awfully late in the game. You argue that the payment in 2012 demonstrates the lack of materiality. I think it demonstrates the lack of materiality with respect to the certified claim. I think there are other reasons, like the one I just explained, why there is no reason to believe materiality, or at least not proof of materiality with respect to the rest of it. But I think it's undeniable that the District Judge Leimbach was correct that payment of the 2012 certified claim, 100 cents on the dollar, is a pretty good indication that it wasn't material. Because after all, the government investigated this for four years, and then this is five years after they've had Mr. Barco's complaint. And after all of that, they thought that it was appropriate to pay 100 cents on the dollar, and I think both McBride and the Fifth Circuit's recent decision on Harmon stand very powerfully for the proposition that that's powerful evidence that it's not material. But how do we know that the government was aware of this specific evidence? For instance, this declaration of Mr. Ramey, because, and just by the way, he says that I think this happened between February 2004 to February 2005 when he was a site supervisor. I mean, this declaration isn't dated until 2015. So how do we know that the government was aware of the evidence that's presented here? Well, a couple of things. First, the government is served with copies of all of the documents in this case. And so the government is aware of when they started sorting the Ramey thing, that goes to an AUSA who was made aware of it. But more importantly is the things that the omissions that Mr. Barco says are material are the things that he identifies, which are things that are included in the complaint itself. Like he says, well, you didn't tell the government when you made that certified claim about these two inspection reports, these two engineering reports. But those engineering reports are part of the complaint. And so those are the things that the government has been on notice of since 2007. They're exactly the sorts of things. It's exactly the same inference that you can draw from a bribe, that they were aware of the allegations there, and awareness of the allegations is enough to conclude it's not material. And I think that makes a lot of sense because, you know, under this sort of common law idea of what materiality is, if they're aware of the allegations and they don't investigate them, they probably weren't very important. And the only other alternative is that they investigated them and didn't find anything there, which, again, is another indication there was nothing material. I have one question about the crime fraud. Judge Gwynne talked about that at some length, the exception for the COBC reports and rejected the claim. And after Judge Gwynne's decision, as I understand it, there was an appeal, and that's KBR 2. Is that correct? That's correct. Okay. I can't find any indication that the plaintiff, Barco, raised the crime fraud ruling in his appeal in KBR 2. That's correct. Well, it was our appeal. It was a mandamus petition. But it's true, and I think that's an additional basis, especially when you consider that— So that—so, I mean, just to round it off, it seems to me we don't have to consider that because Judge Gwynne's ruling is law of the case and hasn't been challenged—wasn't challenged when they had an opportunity. I don't know about law of the case, but certainly I think there's two basis for affirming on that ground. First, that it wasn't an abuse of discretion, which is the proper standard for that. But secondly, that he should have challenged it when he had the opportunity. He did raise alternative basis for denying mandamus in KBR 1, which wound up being the basis that was then later the subject of KBR 2, which was waiver. And so he certainly could have raised this crime fraud exception then, and I think the real kicker here is when this court said in KBR 2 that they trusted this conclusively resolved as privilege issue— Definitely. At that point— Definitively. Definitely. Definitively resolved this privilege issue. That would have been a very good point to raise their hand and say, well, there's one other issue here. And, you know, they don't have to ask for a re-hearing on bank. It's enough that they could just ask for panel re-hearing to say that this is conclusively resolving this rather than lying in wait for another couple of years and bringing it up again. Okay. Okay. Thank you. Thank you. A few points. First, during mandamus action, we strenuously argued that the court didn't even have jurisdiction to hear the original case because of mandamus— because attorney-client issues didn't trigger mandamus. That was our lead argument, and we argued forcefully on that. I think it would be disingenuine for us to put in our briefs and say, oh, by the way, just in case you want to disregard our argument, there's another one you should rule on. The fact is mandamus is controlled by the issues accepted by the court, and the waiver argument was not— well, first, because KBR won on the crime fraud, there was no possibility that that ruling would have any adverse effect on KBR. And without the adverse effect, we could not establish jurisdiction, and that's why we didn't raise it. We just thought we just were lawfully prevented from doing so, that there was no jurisdiction that provided us an opportunity to do so. Second, I'd like to— Because it was a discretionary ruling of the district court? Is that your point? It was—no, but it was subject to the final appeal. And so instead of taking up a mandamus in the middle of the case, we understood that we were lawfully only allowed to raise it as part of our final appeal, and we just accepted. We said, okay, that's it. If we could have argued and raised it then, if we really thought we could, believe me, that was the one I wanted to win most. So—and I note that as far as the kickbacks, one, Mr. Ramey submitted a COBC complaint, so we can really time when he made those, which is exactly when the investigation is going on. And it's important to note that the kickback, you're looking at the exact same time, the same place, the same location. The trailer, in fact, where Mr. Gerlach spent most of his time, instead of at KVR's trailers and DNP's trailers. And Mr. Poe is the site manager who reported directly to Mr. Gerlach. And— So which contract did this corrupt? It—the evidence demonstrates that all of the contracts identified in the amended complaint were corrupted. And for specific reasons, first, all of those contracts were locked away and secreted by Mr. Gerlach himself in his office in violation of KVR rules and regulations. That in and of itself is an indication that this set of contracts are troublesome. And you have also— Which contract did this particular payment, specific payment, corrupt? There—I think VAVR does not require that payments be tied to a specific contract at all. It's enough to connect the creativity with a specific kind of treatment. And in this case, the treatment is awarding contracts that shouldn't be awarded and turning your back on all sorts of problems in the performance of the contract. And also, you should also keep in mind that there was a second issue concerning a bribe in Susan Raku's declaration, where she confirms that she was offered a bribe of a satellite TV if she would agree not to enforce DNP's contracting standards. So it's not just one, there's two. And you have eyewitness accounts of Gerlach browbeating subcontract administrators. You have DNP getting access to competitor pricing. You have terminating the employee who raised the fact that Gerlach had an improper relationship with DNP. You have DNP getting contracts when they're not the lowest bidder. You have eyewitness accounts of DNP getting preferential treatment and eyewitness accounts that there was failed performance and no accountability. You have private email account communications between DNP and KBR. You had DNP with a Swiss bank account and no accounting standards that allowed them to freely flush money any which way they wanted. You have Mr. Dowd, the owner of DNP, communicating with KBR's chief operating officer that a competitor had submitted a lower bid and he wanted KBR's chief operating officer to weigh in on his favor, and he did. And you had the B6 man camp couldn't be terminated unless the chief operating officer was brought into the picture and he didn't want it terminated for business reasons. You had DNP being identified as being the disqualified bidder and still being awarded the contract. You have the B6 man camp contract. You have the fact that they falsified in the contract documentations that the B6 subcontract had been awarded by Covelli when it had been awarded by Gerlach. And you had the B6 site manager saying the company that needs to get this contract is PPI because they're the most qualified, they're on site, and they've already done this exact type of construction timely, for the government, and of high quality. And he also writes an email saying that KBR is incapable of timely performance and performing on that contract. The contract was a time of the essence, 90-day requirement. Nineteen months later, all that stood was a steel structure. They had to build four dormitories. One steel structure for one of the four dormitories, that's it. No walls, no anything. And of that one steel structure, every well was defective and the structure was condemned. And based on that construction activity in the certified claim, KBR claims they completed 50% of the contract. It's just simply mathematically impossible. Okay, I think we have your argument. Thank you very much. Thank you, Your Honor. The case is submitted.
judges: Kavanaugh, Wilkins, Randolph